

**THE CITY OF NEW YORK**
## LAW DEPARTMENT
100 CHURCH STREET
NEW YORK, NY 10007-2601

**MICHAEL A. CARDOZO**
*Corporation Counsel*

**ANDREA O'CONNOR**
Labor and Employment Law Division
Telephone: (212) 676-2750
Fax No.: (212) 788-8877
E-mail:aoconnor@law.nyc.gov

January 11, 2011

**BY ECF and Facsimile**
Honorable I. Leo Glasser
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:  Wilk v. VIP Health Care Services, Inc., et al.
     Docket No. 10 CV 5530 (ILG)(JO)

Dear Judge Glasser:

I am an Assistant Corporation Counsel in the office of Michael A. Cardozo, Corporation Counsel of the City of New York, attorney for defendants City of New York, New York City Human Resources Administration ("HRA") and Robert Doar (collectively "Municipal Defendants") in the above-referenced collective action brought pursuant to the Fair Labor Standards Act ("FLSA"). I write today to respectfully request that, in the interest of justice and the efficient disposition of the business of the court, this action be reassigned from Magistrate Judge James Orenstein to Magistrate Judge Joan Azrack for all pre-trial matters, including discovery. Co-defendants, VIP Health Care Services, Inc., consent to this request. Plaintiff does not consent to this request.

On August 12, 2003, plaintiff's counsel in this action commenced Godlewska v. Human Development Association, Inc., Docket No. 03 CV 3985(DGT)(JMA)[1] pursuant to the FLSA and the New York State Labor Law alleging that Human Development Association ("HDA") did not pay plaintiffs the prevailing and/or minimum wage and overtime. In December 2005, plaintiffs' amended their complaint to include the City of New York, HRA and the former commissioner of HRA, Verna Eggleston, under the theory that the City of New York and HRA were allegedly "joint employers" of plaintiffs.

By way of background, HDA, and co-defendant herein, VIP Health Care Services, Inc. ("VIP"), are agencies that provide home attendant services to individuals receiving

---

[1] Judge Trager was the District Judge assigned to Godlewska.

Medicare and/or Medicaid.  As per New York State Department of Health regulations, HRA receives a referral for services for a particular client and HRA then refers the client to one of several agencies that it contracts with to provide the home attendant services.  HDA and VIP are two such agencies.  Both HDA and VIP employ the home attendants that provide services to the clients and these are the home attendants that are the plaintiffs in both these collective actions.

In both the instant case and Godlewska, the plaintiffs are alleging that both the agency, i.e. HDA and VIP, and the Municipal defendants violated the FLSA by failing to pay them the minimum and/or prevailing wage, failing to pay overtime, including overtime for alleged "overnight" work shifts.[2]  A comparison of the complaint in the instant action to the Third Amended Complaint in Godlewska, a copy of which is annexed hereto for the Court's convenience as Appendix A, demonstrates that the FLSA and labor law claims are identical.  Indeed, not only are the allegations in the two complaints the same, but it appears as though the allegations contained in the instant complaint that are asserted "upon information and belief" are based upon information obtained by plaintiff's counsel during discovery in Godlewska.

As the claims brought pursuant to the FLSA and State Labor Law are identical in the instant case and in Godlewska, it necessarily follows that discovery in the two actions will also be comparable.  In Godlewska, Magistrate Judge Azrack has presided over all discovery matters since that case's filing and is therefore fully familiar with all the discovery issues that the parties have encountered in that case.  Indeed, because of complex discovery issues, including service of additional notices of pendency, HIPPA-related confidentiality issues, disputes regarding electronic discovery, document discovery spanning a time period of ten years, and ongoing concerns regarding the scope of depositions, the parties have been reporting to Judge Azrack for in-person conferences on a near monthly basis.  Judge Azrack has been closely monitoring all aspects of discovery in Godlewska and therefore her institutional knowledge of the complex discovery process in Godlewska would most certainly assist in the efficient disposition of the instant case.  Moreover, Judge Azrack was instrumental in developing, and is therefore fully familiar with, the multifaceted motion schedule that is currently pending before the Court concerning, among other things, a motion to decertify Godlewska as a collective action.

As the instant matter contains identical FLSA and labor law claims as in Godlewska, and therefore discovery in this matter will most likely mirror that in Godlewska, it would most certainly further the efficient disposition of the instant case to have Judge Azrack preside over the instant case.

---

[2] Plaintiffs in both the instant action and in Godlewska allege that Municipal Defendants are "joint employers" of the home attendants employed by VIP and HDA because the contract entered into between Municipal Defendants and agencies that provide home care services to Medicare clients allegedly provides Municipal Defendants with substantial control over the terms and conditions of employment of plaintiffs.  For example, plaintiffs argue that the contract, among other things, allegedly permits Municipal Defendants to control the hours worked by and wages paid to home attendants and allegedly monitors and evaluates the performance of home attendants.  However, the evidence will establish that the Municipal Defendants are not a joint employer as a matter of law.

Accordingly, Municipal Defendants' respectfully request that the instant case be reassigned to Magistrate Judge Azrack.

Thank you for your consideration of this request.

Respectfully submitted,

Andrea O'Connor
Assistant Corporation Counsel
aoconnor@law.nyc.gov

c:    Honorable James Orenstein, United States Magistrate Judge (by ECF)
      Robert Wisniewski, Esq., Attorney for Plaintiffs (by ECF)
      Jason Zoldessy, Esq., Attorney for VIP defendants (by ECF)

# Appendix A

ROBERT WISNIEWSKI (RW-5308)
ROBERT WISNIEWSKI & ASSOCIATES P.C.
225 Broadway, Suite 612
New York, New York 10007
(212) 267-2101

CONSTANTINE P. KOKKORIS (CK-6045)
Attorney at Law
225 Broadway, Suite 612
New York, New York 10007
(212) 349-9340

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
ELZBIETA GODLEWSKA,  KRYSTYNA BIELAWSKA,
BARBARA HATALA, BARBARA PILCH and BOLESLAW
PRZYGODA, on behalf of themselves and all others          **Docket No.: 03-cv-03985**
similarly situated,                                                              **(DGT)(JMA)**
                                        Plaintiffs,

                                                                          **THIRD AMENDED**
                                                                          **CLASS ACTION AND**
                        -- against –                                  **RICO COMPLAINT**

HDA, HUMAN DEVELOPMENT ASSOCIATION, INC.          **JURY TRIAL**
d/b/a HDA, YECHILA GRUENWALD a/k/a YECHIEL          **DEMANDED**
GRUENWALD individually and as Executive Director of HDA,
HUMAN DEVELOPMENT ASSOCIATION, INC., ZVI
KESTENBAUM, MARINA VOSKOBOYNIKO, GOLDA
POKHIS a/k/a OLGA POKHIS, MARGARITA ZILBERT,
EVA FRIEDMAN, IRENA GADZHIYEVA, SARAH
JUROVIESKY, ELLA RASHKOVA, BELLA SLOMIVC,
RITA STRASHNOV, THE CITY OF NEW YORK, NEW
YORK CITY HUMAN RESOURCES ADMINISTATION
And VERNA EGGLESTON, As Commissioner of NYC
Human Resources Administration,

                                        Defendants.
-------------------------------------------------------------------x

## PRELIMINARY STATEMENT

1.     This is a civil action brought to recover unpaid prevailing, minimum and overtime

wages, liquidated damages and reasonable attorneys fees as well as damages for retaliation under

the provisions of the Fair Labor Standards Act of 1938, as amended (29 U.S.C. § 201, et seq.) ("FLSA"), the Civil Rights Act of 1871 (42 U.S.C. §§ 1983 and 1988) the New York Minimum Wage Act (New York State Labor Law Articles 6 and 19) ("NYMWA") and New York State common law, to recover actual damages, treble damages and punitive damages for violations of the Organized Crime Control Act of 1970, Racketeer Influenced and Corrupt Organizations (18 U.S.C. § 1964) ("RICO"), New York State Labor Law ("Labor Law") § 198-b and § 193 and to recover on claims for duress and unjust enrichment under New York State common law.

2.    The defendants are a not-for-profit agency under contract with the municipal defendants that employ home attendants in private households with Medicare/Medicaid funding, and the not-for-profit agency's officers and supervisors, known as "personnel specialists."  The plaintiffs are home attendants employed by the defendants who regularly worked over 40 hours per week, but were not compensated properly pursuant to the municipal contracts or for overtime hours or overnight shifts.  In addition, defendant personnel specialists maintained a pattern and practice of demanding "kickbacks" from the plaintiffs and other similarly situated employees in exchange for placement and continuing employment with the agency, and whenever timely payment was not made, defendant supervisors would refuse job assignments to plaintiffs or would withhold or delay plaintiffs' wages or would reassign plaintiffs to job assignments considered less desirable.

## JURSIDICTION AND VENUE

3.    The jurisdiction of this Court is invoked under 29 U.S.C. § 216 (FLSA); 42 U.S.C. § 1983 (Civil Rights); 28 U.S.C. § 1337 (Regulation of Commerce), 18 U.S.C. § 1964 (RICO); 28 U.S.C. § 1331 (Federal Question).  This Court has jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

4.      Venue is vested in the Eastern District of New York pursuant to 28 U.S.C. § 1391.

## JURY DEMAND

5.      Plaintiffs demand a trial by jury of all issues so triable in this action.

## PARTIES

6.      Plaintiffs ELZBIETA GODLEWSKA ("Godlewska") and BARBARA HATALA ("Hatala") are residents of the County of Queens, State of New York and are current and/or former employees of the defendants.

7.      Plaintiff  KRYSTYNA BIELAWSKA ("Bielawska") and BARBARA PILCH ("Pilch") are residents of the County of Kings, State of New York and are former employees of the defendants.

8.      Plaintiff  BOLESLAW PRZYGODA ("Przygoda") is a resident of County of Queens, State of New York, and is a current employee of the defendants.

9.      Upon information and belief, at all times relevant to this action, Defendant HDA, HUMAN DEVELOPMENT ASSOCIATION, INC. ("HDA") was and still is a corporation incorporated under the laws of the State of New York that maintains a principal place of business at 12 Heyward Street, County of Kings, State of New York, and an "employer" within the meaning of the FLSA.

10.      Upon information and belief, at all times relevant to this action, Defendant YECHILA GRUENWALD a/k/a YECHIEL GRUENWALD ("Gruenwald"), was and still is the Executive Director of HDA, and a resident of the County of Kings, State of New York.

11.      Upon information and belief, at all times relevant to this action, Defendant ZVI KESTENBAUM ("Kestenbaum"), was and still is the President of HDA, and a resident of the County of Kings, State of New York.

12.     Defendants MARINA VOSKOBOYNIKO ("Voskoboyniko"), GOLDA POKHIS a/k/a OLGA POKHIS ("Pokhis"), MARGARITA ZILBERT ("Zilbert"), EVA FRIEDMAN ("Friedman"), IRENA GADZHIYEVA ("Gadzhiyeva"), SARAH JUROVIESKY ("Juroviesky"), ELLA RASHKOVA ("Rashkova"), BELLA SLOMIVC ("Slomivc") and RITA STRASHNOV ("Strashnov") are  the "personnel specialists" employed by HDA (collectively, "Personnel Specialists"), whose function it is, among others, to manage, supervise and assign jobs to plaintiffs and other home attendants employed by HDA, and who at all times relevant hereto, maintained a pattern of demanding "kickbacks" from plaintiffs and other home attendants for assigning jobs and later continuing the job assignments.  (HDA, Gruenwald, Kestenbaum, and the Personnel Specialists are collectively referred to as the "HDA Defendants")

13.     Defendant CITY OF NEW YORK ("City") is a municipal corporation incorporated under the laws of the State of New York and an "employer" within the meaning of the FLSA.

14.     Defendant NEW YORK CITY HUMAN RESOURCES ADMINISTRATION ("HRA") is a public agency and an "employer" within the meaning of the FLSA.

15.     Defendant VERNA EGGLESTON ("Eggleston") is Commissioner of the HRA, its chief policy-making official and is sued in her official capacity. Defendant Eggleston, at all times relevant to this complaint, acted under color of law in the course and scope of her duties and functions as employee and agent of the City and HRA in engaging in the conduct described herein.  Upon information and belief, Ms. Eggleston is a resident of New York State, New York County. (City, HRA and Eggleston are collectively referred to as the "Municipal Defendants")

## FACTUAL ALLEGATIONS

### General Allegations

16.     The defendants engage in an enterprise whose annual volume of sales made or

business done is not less than $500,000.00, the activities of which affect interstate commerce in that:  a)  the employees of said defendants handle, sell or otherwise work on goods or materials that have been moved in or produced for interstate commerce; b) the employees free members of the household in which they are employed to themselves engage in activities in interstate commerce; and c) defendants receive federal Medicare and/or Medicaid funding through the HRA for home attendant services performed by their employees, and defendants are thus employers subject to the jurisdiction of the FLSA and RICO.

17.    Upon information and belief, defendant HDA operates under periodic contracts (the "Contract") with the Municipal Defendants for the provision of home attendant services to the residents of the City of New York, and more specifically of the borough of Brooklyn.  The home attendant services are funded by federal Medicare and/or Medicaid monies disbursed by the HRA and the New York State Department of Health and received by defendant HDA on behalf of eligible families.  Defendant HDA hires and pays the wages of the home attendants with the Medicare/Medicaid monies it receives from defendant HRA.

18.    The Contract provides the Municipal Defendants with substantial control over the terms and conditions of employment of the plaintiffs and other home attendants employed by defendant HDA.  The Contract provides for reimbursement of wages paid by defendant HDA to its employees by defendant HRA, and allows the Municipal Defendants to set limits on the hourly rates and total weekly wages paid for the services performed by defendant HDA's employees, allowing the Municipal Defendants to effectively control the hours worked by and the wages paid to plaintiffs and other employees of defendant HDA.

19.    The Contract also requires detailed records to be created and maintained by defendant HDA regarding the hours of work and services provided by its employees.  As a

condition of reimbursement to HDA for wages paid to its employees, HDA must send records of the hours worked by its employees with its invoices for review and approval by the Municipal Defendants.

20.     Upon information and belief, pursuant to the Contract, the Municipal Defendants monitor and evaluate the performance of home attendants employed by defendant HDA through direct contact with patients receiving the care and their families, and review of HDA's records. Based upon its evaluation and review of the performance of HDA and its employees, the Municipal Defendants may provide technical assistance to HDA, change the assignment of cases to HDA employees, or limit wages reimbursed to HDA.

21.     Notwithstanding the control retained by the Municipal Defendants over the wages paid to and hours worked by HDA's employees, the Contract also requires defendant HDA to "provide home attendants with a wage package at a level comparable to that offered by not-for-profit home care agencies' collective bargaining agreements which include at a minimum: base wage and differential for longevity, mutual cases, weekends, single client sleep-in, and mutual case sleep-in."

22.     Furthermore, the Contract requires defendant HDA to "provide home attendants with a benefits package at a level comparable to that offered by not-for-profit home care agencies' collective bargaining agreements. . ." which includes health, medical and retirement benefits not requiring employee contribution.  Workers compensation and other mandatory insurance coverage for employees is also required by the Contract.

23.     The Contract contains an appendix which describes the job duties which may be performed by home attendants employed by defendant HDA.  Among the duties described are duties which constitute general household work, as defined by relevant provisions of the FLSA

and the NYMWA and regulations promulgated by the Department of Labor's Wage and Hour Division and codified at 29 C.F.R. § 552.

24.     Defendant HDA published and distributed to its employees a handbook that described the employment policies and practices of HDA with respect to its home attendant employees (the "handbook") and also sets forth agency rules and regulations, and duties and responsibilities of home attendant employees, including general household work.

25.     The plaintiffs have been employees of the defendants during the six years immediately preceding the initiation of this action and have performed labor and services as domestic service employees in private households as defined by the FLSA and the NYMWA and regulations promulgated by the Department of Labor's Wage and Hour Division and codified at 29 C.F.R. § 552, but the plaintiffs have not received the compensation required by the FLSA, the NYMWA and/or the common law of the State of New York.

26.     Although plaintiffs were employed as home attendants pursuant to which they provided companionship services to elderly and infirm clients of the defendants, the plaintiffs' job duties and responsibilities, as set forth in the Contract and the handbook, also included the performance of general household work which exceeded 20 percent of the total weekly hours worked, thus qualifying plaintiffs as domestic service employees subject to the minimum wage and overtime provisions of the FLSA and the NYMWA.

27.     Furthermore, as set forth in the handbook, defendants required that plaintiffs possess a valid Home Attendant Training Certificate issued by a training program approved by the New York State Department of Health prior to start of employment, and require in-service training as mandated by the New York State Department of Health every six months, thus qualifying plaintiffs as trained personnel and domestic service employees subject to the minimum

wage and overtime provisions of the FLSA and the NYMWA.

28.    At al times relevant hereto, all of the plaintiffs herein in fact possessed valid Home Attendant Training Certificates and had undergone the requisite training required by the New York State Department of Health.

29.    Plaintiffs regularly worked in excess of 40 hours per week but were not paid the proper overtime rate under Federal and New York State law and the wage orders promulgated thereunder.

30.    Plaintiffs also regularly worked overnight shifts, and shifts in excess of ten hours, although they did not reside in the households in which they worked, for which they were not paid the proper wages, minimum wages or overtime rates under Federal and New York State law, and defendants improperly deducted sleep time from plaintiffs' wages.

31.    Although the plaintiffs were technically employed by defendant HDA in that they received paychecks from HDA, the individual defendants and the Municipal Defendants had substantial control over the conditions of plaintiffs' employment, their work schedules, the rates and methods of payment of their wages and the maintenance of employment records, such that all of the defendants were joint employers of the plaintiffs, as a matter of economic reality.

32.    Pursuant to their monitoring and evaluation of plaintiffs' work and through their receipt and review of time records, payroll records, invoices, case files, and other sources of information, all defendants had actual and/or constructive knowledge of the hours worked and the services performed by the plaintiffs.

33.    Although the HDA handbook states that home attendant employees were not to work overtime without prior approval from "personnel specialists" and that "HDA will not pay for overtime," the defendants in fact requested that plaintiffs work over 40 hours per week, and

plaintiffs regularly worked over 40 hours per week with the actual and/or constructive knowledge and/or consent of the defendants.

34.     Furthermore, Defendant Personnel Specialists maintained a pattern and practice of regularly demanding that plaintiffs pay them sums of money in varying amounts in order to be placed in job assignments and in order for their employment to be continued.  If plaintiffs failed to make the payments on a timely basis, defendants would refuse job assignments to plaintiffs and would withhold plaintiffs' wages, make unauthorized deductions from their wages, delay payment of wages and would otherwise exploit the plaintiffs' fear of economic harm in order to induce them to pay the "kick-backs."

35.     Although the handbook states that "[h]ome attendants are expressly forbidden to offer gifts of money, merchandise or free service to administrative staff. . . in exchange for assignments," and purports to provide that such gifts will result in immediate dismissal of a home attendant, in fact defendant Personnel Specialists regularly demanded "kick-backs" from plaintiffs in exchange for placement and continued employment with the actual and/or constructive knowledge of Defendants Gruenwald and Kestenbaum, as well as other managerial staff of HDA.

36.     The various violations of law which are alleged herein were committed intentionally and/or willfully by the defendants.

37.     At all times relevant herein, Gruenwald, Kestenbaum and Personnel Specialists have acted for and on behalf of defendant HDA, with the power and authority vested in them as officers, agents and employees of defendant HDA, and have acted in the course and scope of their duties and functions as agents, employees and officers of defendant HDA and with the knowledge and acquiescence of HDA and defendants Gruenwald, as Executive Director, and

Kestenbaum, as President, of HDA.

38.     At all times herein, each of Gruenwald, Kestenbaum and Personnel Specialists has directly managed, handled, or been responsible for, the payroll and/or payroll calculations and signing or issuing checks for the Plaintiffs and others similarly situated or by virtue of his/her position with HDA has been responsible for the proper management and handling of the payroll and payroll calculations at HDA.

39.      Gruenwald, Kestenbaum and Personnel Specialists have willfully and intentionally acted to violate the laws, rules, regulations, statutes and wage orders alleged herein, and by doing so and by virtue of their positions as controlling owners, shareholders, directors, officers and/or managers of the Corporate Defendants, have assumed personal liability for the claims of the Plaintiffs herein.

40.     Upon information and belief, at all times relevant herein, the HDA Defendants and the Municipal Defendants were joint employers of Plaintiffs and are jointly and severally liable for all claims made herein by Plaintiffs.

41.     The various violations of law which are alleged herein were committed intentionally and/or willfully by all Defendants.

42.     All Defendants are joint employers of Plaintiff and as a result, all Defendants, individually and collectively, and jointly and severally, are liable for all claims made herein.

### Plaintiff Elzbieta Godlewska

43.     Plaintiff Godlewska began her employment with defendant HDA on or about October 1996.  At the time of her hire, Goldlewska was informed by other employees of HDA that a cash payment of $1,000.00 was necessary in order to obtain a job assignment.

44.     Soon thereafter, Godlewska met defendant Voskoboyniko in plaintiff Hatala's

apartment at 37 Russell Street in Brooklyn.  Voskoboyniko demanded a cash "kickback" that day. Plaintiff  Godlewska understood that her failure to pay the demanded sum would result in no job assignment being offered to her.

45.     On or about November 1996, plaintiff Godlewska borrowed money from friends and made a cash payment of $1,000.00 to defendant Voskoboyniko, who thereafter offered Godlewska a full-time job assignment, which Godlewska held steadily until on or about January 1997.

46.     From on or about January 1997 through February 1997, plaintiff Godlewska was available to work but was not assigned any job because she refused to make further payments to defendant Voskoboyniko, who on numerous occasions demanded cash payments beyond the $1,000.00 she had already received.

47.     Finally, on or about February 1997, Voskoboyniko assigned Godlewska to a job in which Godlewska continued to work until July 1997. During that time, Voskoboyniko on numerous occasions demanded additional cash payments from Goldewska under the threat of pulling Godlewska off the job, but Godlewska refused to pay. As a result of her refusal to pay "kickbacks" to Voskoboyniko, Godlewska did not work at all from on or about July 1997 to June 1998, despite her being ready, willing and able to continue working, and despite the fact that there were many assignments at HDA for which Godlewska was qualified. Godlewska understood it to be a punishment for her refusal to give additional "kickbacks."

48.     Godlewska was placed in a job assignment again on or about June 1998 and worked full time at the placement until on or about November 1998.  Again, during this period, Godlewska was approached by defendant Voskoboyniko and other Personnel Specialists for "kickbacks" but she refused to pay.

49.     From on or about November 1998 to January 1999, Godlewska was offered and worked substitution jobs, while the regular attendants were on leave, which were very short in duration and were not full time.

50.     On or about January 1999, Godlewska called defendant Pokhis requesting a full-time assignment to which defendant Pokhis replied that they needed to meet to discuss "certain issues."  Plaintiff understood this to mean that she had to make a cash payment to Pokhis in exchange for a full-time assignment.  Godlewska refused to meet with defendant Pokhis, but continued to make phone calls to Pokhis requesting a full-time placement. Upon information and belief, defendant Pokhis refused to assign Godlewska to a full-time assignment, while offering such full-time jobs to other home attendants with less seniority.

51.     On or about May 1999, Godlewska personally informed HDA Executive Director, defendant Gruenwald, of the demands for "kickbacks" at defendant HDA and, specifically, of her cash payments to defendants Pokhis and Voskoboyniko. Upon information and belief, defendant Gruenwald refused to confront defendant Pokhis or Voskoboyniko, but staged a mock confrontation between Godlewska and other personnel specialists, who had not supervised Godlewska. Upon information and belief, defendant Gruenwald quickly concluded the mock confrontation and took no disciplinary action in response to the allegations of demands for "kickbacks" by defendants Pokhis and Voskoboyniko thereafter.

52.     Since that time, Plaintiff Godlewska has been on the employment rolls of defendant HDA but has not been assigned steady work because she has continued to refuse to give "kickbacks" to defendant Personnel Specialists.  During this time, Godlewska has been ready, willing and able to work full time for HDA, and upon information and belief, full time work was readily available but was given to other home attendants with less seniority.  Instead,

Godlewska has only been offered substitution work as punishment for her continued refusal to give kickbacks to defendant Personnel Specialists.

53.     Defendants Pokhis and  Voskoboyniko continue to work at HDA and HDA assigns full-time work to other home attendants.

**Plaintiff Krystyna Bielawska**

54.     Plaintiff Bielawska began her employment with HDA on or about November 1989.  Plaintiff Bielawska was informed by other employees of HDA that in order to be placed in a job assignment, and in order to keep the job, she would have to give "kickbacks" to supervisors, i.e. Defendant Personnel Specialists.

55.     On or about November 1989, Plaintiff Bielawska made payment of $800.00 in cash, as directed by her supervisor at the time, and was placed in a job assignment.  During approximately the next year and one half, plaintiff Bielawska made periodic payments of $200.00 to the Personnel Specialist in charge of her, as requested.  The Personnel Specialist kept placing Bielawska in substitution and short-term jobs but kept promising Bielawska that she would eventually get a full-time, steady job.  Plaintiff understood that in order to keep her job at HDA, she needed to give more money periodically to the Personnel Specialist in charge.

56.     On or about early 1991, plaintiff Bielawska requested a job from Defendant Voskoboyniko, who said that she would come to Bielawska's house to pick up a work authorization card.  Bielawska understood from other employees that such a visit to an employee's home, which was unusual, meant that the Personnel Specialist would demand a "kickback" in cash.  Bielawska gave $200.00 cash to Defendant Voskoboyniko in an envelope. After the payment to Voskoboyniko, plaintiff Bielawska was given a full-time job assignment.

57.     In subsequent years, Bielawska's supervisor was defendant Pokhis.  During the

next six years, defendant Pokhis periodically demanded payments from plaintiff Bielawska.  The

demand would occur as follows: plaintiff Bielawska would receive a telephone call from

defendant Pokhis in which Pokhis would demand that plaintiff Bielawska "come to the office."

Plaintiff Bielawska would appear at the HDA offices for a personal conversation with defendant

Pokhis. During the conversation, defendant Pokhis would demand: "Did you bring the

chocolate?"  Plaintiff Bielawska understood that this was a veiled demand for a cash "kickback"

to defendant Pokhis and Bielawska did in fact make "kickbacks" to defendant Pokhis. Plaintiff

Bielawska understood that a failure to pay a "kickback" would result in the loss of her job and

therefore always complied with Defendant Pokhis's "kickback" demands.

58.     During the period of defendant Pokhis' supervision of Bielawska, plaintiff

Bielawska was forced to give defendant Pokhis "kickbacks" on approximately eleven occasions,

one payment in the amount of $300.00 and the remaining payments in the amount of $500.00.

59.     From on or about October 2000 to August 2001, Bielawska's "personal

supervisor" was defendant Zilbert.  Zilbert called plaintiff Bielawska on numerous occasions at

home asking that Bielawska come to the office and "bring some chocolate." Plaintiff Bielawska

understood each time that she had to make another "kickback" payment in order to keep her job.

Plaintiff Bielawska complied by making only two payments of $300.00 each in cash to

Defendant Zilbert, one of which was made on or about April 12, 2001.

60.     On or about August 2001, Bielawska's ward passed away.  From the time of her

ward's death until on or about September 2001, Bielawska called defendant Zilbert frequently for

another job assignment.  Each time Bielawska called, Zilbert told her that there were no job

assignments available, but that she wanted to meet with Bielawska in person.  Bielawska

responded that she could not meet with her, but that she needed work.  Zilbert then told

Bielawska that there were no assignments available.  After several such exchanges on the telephone, Bielawska began to complain to Zilbert that she was unfairly being denied job opportunities because of her failure to pay "kickbacks." Finally, during one such telephone call in September 2001, Zilbert told Bielawska not to call again, and hung up the phone on her.

61.    Upon information and belief, plaintiff Bielawska was never given another job assignment by defendants Zilbert and HDA in retaliation for Biewlawska's failure to pay "kickbacks" to defendant Zilbert.

62.    Upon information and belief, defendants Zilbert and HDA communicated to other employment agencies that plaintiff Bielawska was "dangerous" and a "troublemaker" and has in effect, "blacklisted" Bielawska in retaliation for Bielawska's failure to pay "kickbacks" and her complaints to Zilbert about the unfairness of the demands.  As a result, plaintiff Bielawska has found it difficult to find work at other employment agencies.

### Plaintiff Barbara Hatala

63.    Plaintiff began her employment with defendant HDA on or about October of 1990.  She held a steady job assignment at HDA until the ward she was caring for transferred to a different employment agency.  She continued to care for the same ward through a different agency for approximately two years until on or about January1995.

64.    On or about December 1994, Hatala was offered a new job assignment by defendant Voskoboyniko through defendant HDA.  However, before placed in the new assignment, defendant Voskoboyniko demanded a "kickback" payment of $1,200.00 from Hatala in exchange for the assignment.  Hatala refused to pay the "kickback" until defendant Pokhis called her a few days later, and told her to strike a deal with Voskoboyniko to get the job.  Plaintiff then met Defendant Voskoboyniko on or about the last week of December, 1994 and

handed Voskoboyniko $1,200.00 in cash.

65.     After Hatala made the payment to defendant Voskoboyniko, plaintiff received the assignment through HDA.

66.     On or about January 1995, defendant Voskoboyniko requested more money because, as she said, plaintiff Hatala had "such a good job but could lose it at any time." Plaintiff Hatala understood this to mean that if she failed to pay, her employment with HDA would cease.

67.     In or about January 1995, Plaintiff Hatala, in response to Voskoboyniko's demand and fearing the loss of the recently-acquired job, made a payment of $300.00 in cash to Defendant Pokhis, and $200.00 in cash to Defendant Voskoboyniko. Upon receiving the "kickback" payment, defendant Voskoboyniko stated to Hatala that she was the one who decided who stayed on the job or got a different one.  Again, Plaintiff  Hatala understood that failure to pay a timely "kickback" would result in the loss of her job.

68.     Several months later in 1995, defendant Voskoboyniko told plaintiff Hatala that since Hatala was taking leave for vacation, Hatala needed to make another "kickback" payment in order to keep the same job when she returned. Hatala complied with Voskoboyniko's demand by making a cash payment of $500.00 to Voskoboyniko.  Plaintiff Hatala understood that if she did not pay the money, she would lose the job.

69.     On or about October 1995, Hatala's ward transferred to another employment agency. Due to financial hardship, plaintiff Hatala could not comply with the HDA Personnel Specialists' continued demands for kickbacks. At the time, Plaintiff Hatala was ready, willing and able to continue working full-time for HDA, but as punishment for her failure to pay "kickbacks," Hatala was not given another assignment, and had to apply for unemployment benefits.

70.     In or about April 1996, Plaintiff Hatala called Defendant Zilbert to request a placement, and Zilbert demanded a "kickback."  On or about April 1996 plaintiff made a cash payment of $1,000.00 to Defendant Zilbert. After she had made the cash payment, Plaintiff Hatala was placed in another job assignment through HDA.

71.     From approximately April 1996 to December 1996 plaintiff Hatala did not make any more payments to defendant Zilbert.  On or about December 1996, however, Hatala received a call at home from Defendant Zilbert complaining of not having "received money lately." Defendant Zilbert implied, and Plaintiff Hatala understood, that a non-payment would result in the loss of Hatala's job.

72.     On or about mid- December 1996, Hatala gave $500 in cash to Defendant Zilbert. Plaintiff Hatala made a payment in the belief that her failure to do so would result in her loss of the job.

73.     Some time later, Hatala was told by Zilbert that a new supervisor, Defendant Friedman, would be handling her henceforth. On or about April 1997, Hatala contacted Defendant Friedman for a new job assignment.

74.     On or about March of 1999, Hatala's ward passed away, but defendant Friedman refused to give Hatala a full-time steady assignment, instead giving her substitutions and short-term assignments.  Upon information and belief, Hatala did not receive a full-time steady assignment because she did not pay "kickbacks" to Friedman, who had periodically requested them.

75.     On or about April 12, 1999, defendant Friedman summoned plaintiff Hatala to come to HDA's offices the same day to discuss "important matters."  Hatala understood this to mean that a cash payment was being demanded, and that if she did not pay, she would not receive

any new job assignment, and would lose her job at HDA altogether. On the same day Hatala met defendant Friedman and gave her $500 in cash.

76.    On the same day that the payment was made, Hatala received a new assignment from Friedman.

77.    The new assignment was caring for Ms. Margot Berkowitz, and it lasted until Ms. Berkowitz passed away, in April 2000.  During this work assignment, Hatala was required to clean the entire house, including chandeliers.  She also did laundry, ironed and went shopping for Ms. Berkowitz.

78.    On or about May 1999, defendant Friedman once again demanded a "kickback" payment from Hatala in exchange for continued employment.  Friedman did so by calling Hatala and telling her that Ms. Berkowitz, her ward, was complaining about her, and that Friedman was thinking of reassigning her.  Hatala paid $500 in cash to Friedman again, at Friedman's office. Hatala understood that this payment was required in order for her employment caring for Ms. Berkowitz to continue.  Friedman then temporarily stopped calling Hatala and threatening to reassign her.

79.    However, defendant Friedman eventually resumed her demands for "kickbacks" from Hatala, and began calling her again, threatening to reassign her.  This time, Hatala refused to make any more payments to Defendant Friedman.

80.    Plaintiff Hatala continued to care for Ms. Berkowitz until April 2000, when Ms. Berkowitz passed away, during the Passover holiday of that year.  Immediately thereafter, plaintiff Hatala placed telephone calls to defendant Freidman at defendants' offices on an almost daily basis seeking another work assignment.

81.    Each time Hatala called the office seeking work, defendant Friedman told Hatala

to come to the office, because "we need to see each other."  Each time defendant requested that Hatala come to the office, Hatala declined, telling Friedman that she did not need to see her, she just needed work.  Each time Hatala declined to meet with Friedman, Friedman told her that "right now, there is no work for you."  This exchange occurred several times per week from the time that Hatala's ward, Ms. Berkowitz, passed away, until on or about July 2000.

82.     Plaintiff Hatala understood defendant Friedman's requests to be a demand for "kickback" payments in exchange for continued steady work assignments.  Hatala also understood that due to her refusal to "meet" and make payments to Friedman, Friedman was refusing to give her another steady work assignment.

83.     During the period of time from the death of Ms. Berkowitz until July 2000, plaintiff Hatala was given only two work assignments by defendants, which were each two-week substitution jobs in which she cared for Ms. Sarah Weiss in Borough Park, Brooklyn and a Mr. Schwartzberger in April and May 2000, while the wards' regular attendants were on temporary leave.

84.     On or about July 10, 2000, when Hatala called Friedman once again for a job assignment, and once again refused to meet with her, Friedman told Hatala, "do not call me again, I will not have any jobs for you." After this conversation, Hatala received a short term temporary job as a pollster with the U.S. Census Bureau, which lasted less than one month.

85.     On or about July 31, 2000, Hatala was given a steady job assignment by another supervisor at HDA. Her new assignment was caring for Ms. Miriam Berenstein.  In this assignment, Hatala was required to perform the following duties: Doing laundry, ironing clothes and washing dishes for Ms. Berenstein's entire family, and performing work for Ms. Berenstein's daughters and granddaughter.

86.     In consequence of Hatala's refusal to pay any more kickbacks, Hatala has until the filing of this lawsuit been the victim of defendants' retaliatory measures in that she has received less desirable assignments, such as substitutions, part-time assignments or assignments with clients considered by HDA to be difficult.

87.     In addition, Hatala has experienced substantial problems with her paychecks in that she often does not receive full pay for the hours she has worked, with her paychecks sometimes being short an entire day's pay, and Hatala often has had to complain to Friedman and other managers at defendant HDA regarding the amount of her paychecks.

**Plaintiff Barbara Pilch**

88.     Plaintiff Pilch began her employment with HDA in or about June 1993.  Plaintiff's aunt informed her upon her hiring that, in order to be placed on an assignment, Plaintiff would have to give a bribe to her assigned "personel specialist," who at that  time was Defendant Pokhis, otherwise there would be no assignment for her.

89.     In or about January 1994, Plaintiff Pilch, unable to come up with money due to financial straits, gave Defendant Pokhis her gold engagement ring. Upon information and belief, Defendant Pokhis deemed the ring an insufficient bribe and gave Plaintiff Pilch only weekend assignments, which lasted to March 1994. Defendant Pokhis continued to make veiled demands for kickbacks of Pilch. Pilch understood that her failure to give kickbacks to Defendant Pokhis would result in reduced assignments or in the loss of her job altogether.

90.     In or about March 1994, Pilch gave Defendant Pokhis $500 (five hundred dollars) in cash but Defendant Pokhis, indignant at the paucity of the kickback, suggested that Plaintiff be taken over by another personnel specialist, named Daphne. Plaintiff Pilch refused to give any money to Daphne and, as a result, did not get an assignment from Daphne and soon thereafter

was forced to apply for unemployment benefits.

91.     In or about August 1996, Plaintiff Pilch went to HDA to Defendant Voskoboyniko and inquired about a full-time assignment. Defendant Voskoboyniko instead gave Pilch two patients to take care of for 4 hours each at two different locations. Pilch considered the assignment extremely taxing and difficult to fulfill in one day, to which Defendant Voskoboyniko replied that, in due time, she help Pilch get a full-time assignment, but only if Plaintiff  "showed appreciation" for her efforts.  Plaintiff Pilch understood this to mean that she had to pay a kickback.

92.     Later in August 1996, Defendant Voskoboyniko telephoned Pilch and stated: "I have a job for you, but you have to come and see me." Plaintiff understood it that she had to make a payment, and from conversations with other HDA employees, she knew that she had to pay $1,500 (one thousand five hundred dollars) in cash to Defendant Voskoboyniko.

93.     In or about November 1996, Plaintiff Pilch met with Defendant Voskoboyniko at the HDA offices and gave Voskoboyniko $1,500 cash. After receiving the kickback, Voskoboyniko gave Pilch a full-time assignment.

94.     Soon thereafter, Defendant Voskoboyniko would call Pilch every two or three months and make statements to the effect: "I have not seen you lately, I need to see you, my sweetness, tomorrow!" or "You know why I am calling," or "You know how much you need to bring." Plaintiff Pilch understood these statements as Voskoboyniko's demands for a kickback and that a failure to pay a kickback would result in a lesser assignment or a total loss of a job at HDA. After each such telephone conversation with Voskoboyniko, Plaintiff would take a sick day, go to the bank to make a withdrawal and deliver cash in an envelope to Defendant Voskoboyniko at the HDA offices. Voskoboyniko always allowed Pilch to take a sick day to pay

a kickback.

95.     If Pilch failed to show up the next day with the money, as demanded,
Voskoboyniko would call very soon thereafter, and make "inquiries" about the job.  Defendant
would also call at the patient's home a few minutes after the beginning of Plaintiff's shift, and
would speak to the patient with a view to eliciting alleged problems about Pilch. Defendant
Voskoboyniko's other ways of taking retribution for tardy payments of kickbacks was a denial of
a sick day to Pilch if Pilch was late with payments, which was in contrast with Voskoboyniko's
grant of a sick day to Pilch for the specific purpose of obtaining monies and delivering them as a
kickback to Voskoboyniko.

96.     From November 1996 to November 1998, Pilch was forced by Voskoboyniko to
pay periodic kickbacks in the minimum amount of $250 (two hundred fifty dollars), but most
often $300 (three hundred dollars).

97.     When in or about November 1998, Plaintiff Pilch did not respond to Defendant's
phone call requesting a payment, Defendant Voskoboyniko called Plainiff again and said: "You
did not come, so we do not know each other anymore. Do not ask me for anything."  Plaintiff
Pilch understood that she would not get more work unless she paid. Plaintiff refused to pay and
was not given any more assignments, and as a result was forced to go on unemployment from
January 1999. At that time, Pilch was ready, willing and able to work full time at HDA, but was
not given the job as a retaliation for her failure to continue paying kickbacks.

98.     On or about June 2001, defendant Friedman telephoned plaintiff Pilch and told
her that there was work for her, if she wanted to come back.  Plaintiff Pilch agreed to return to
work at HDA, but did not give defendant Friedman any "kickback."  In retaliation for Pilch's
failure to pay a "kickback," defendant Friedman placed Pilch in job assignments which consisted

only of house cleaning work for HDA clients.  Such job assignments were considered onerous and tiring and were undesirable to Pilch.  Pilch understood that she would be doing such cleaning jobs exclusively through HDA until she gave Friedman "kickbacks."

99.     On or about September 2001, Pilch  gave defendant Friedman $1,000.00 in cash. Immediately after receiving the "kickback," defendant Friedman placed Pilch in a full-time home attendant assignment, instead of a cleaning job. But when within a month of being placed, Pilch refused defendant Friedman's demand for another payment, she was immediately pulled off the job and was not reinstated.

100.     Not being able to obtain a full-time assignment from defendant Friedman, plaintiff Pilch was forced to ask another supervisor, Defendant Jane Doe, also known as "Sarah," for work.  "Sarah" told Pilch that there might be work, but Pilch had to wait. Pilch understood that she would not get a job assignment unless she gave "Sarah" "kickbacks."

101.     On or about June 2002, at the HDA offices, Pilch gave "Sarah" $500 in cash in an envelope and two weeks later, Pilch received a full-time job assignment from "Sarah."

### Plaintiff Boleslaw Przygoda

102.     Plaintiff Boleslaw Przygoda started working for Defendant HDA in February 1996, and has been continually employed there until the present day.

103.     At all times relevant herein, Przygoda regularly worked in excess of 40 hours per week but was not paid the proper overtime rate under Federal and New York State law and the wage orders promulgated thereunder.

104.     At all times relevant herein, Plaintiff Przygoda also regularly worked overnight shifts, and shifts in excess of ten hours, although he did not reside in the households in which he worked, for which he was not paid the proper wages, minimum wages or overtime rates under

Federal and New York State law, and defendants improperly deducted sleep time from his wages.

105.    At all times relevant herein, Plaintiff Przygoda as part of his duties regularly performed general household work which constitued more than 20% of the hours he worked in a week.

106.    At all times relevant herein, Defendant Voskoboyniko was the personnel specialist to which Plaintiff Przygoda was assigned, and Przygoda regularly complained to Defendant Voskoboyniko that he had to perform general household work. At all times, Defendant Voskoboyniko replied that she knew and understood this, but that there was nothing she could do about this.

107.    Upon information and belief, the other defendant Personnel Specialists, defendants IRENA GADZHIYEVA, SARAH JUROVIESKY, ELLA RASHKOVA, BELLA SLOMIVC and RITA STRASHNOV, also demanded "kickbacks" from other home attendant employees of HDA in return for continued employment and desirable job assignments, and deprived them of said employment and job assignments if they refused to pay.

## CLASS ALLEGATIONS

108.    Plaintiffs bring this action on behalf of themselves and all other persons who were or are employed by defendants as home attendants and:

        A.    Performed work, labor and services but did not receive the compensation required by the FLSA, other provisions of the Federal Labor Law, the NYMWA, Labor Law, the Contract between the defendants and the common law of the State of New York;

        B.    Paid "kick-backs" to defendants after having had them demanded by defendants;

   C. Refused to pay "kick-backs" demanded by defendants and suffered

     retaliation by the defendants or otherwise sustained damages as a result.

109. Upon information and belief, this class of persons consists of not less than 100

persons, and the class is thus so numerous that joinder of all members is impracticable under the

standards of Fed. R. Civ. P. 23 (a)(1).

110. There are questions of law and fact common to the class which predominate over

any questions affecting only individual members, specifically:

   A. Whether the employment of the plaintiffs by the defendants is subject to

     the jurisdiction and the minimum wage and overtime requirements of the

     FLSA, the NYMWA and Labor Law;

   B. Whether the defendants are joint employers of the plaintiffs pursuant to

     the FLSA, NYMWA and Labor Law;

   C. Whether the defendants maintained a pattern and/or practice of demanding

     "kickbacks" from plaintiffs in exchange for continued employment; and

   D. Whether such a pattern and/or practice of demanding "kick-backs"

     constitutes "racketeering activity" as defined by RICO or is otherwise

     unlawful such that money damages may be recovered under the Labor Law

     and other New York State law.

Only the amount of individual damages sustained by each class member will vary.

111. The claims of the named plaintiffs are typical of the claims of the above-described

class in that all of the members of the class have been similarly affected by the acts and practices

of the defendants.

112. The named plaintiffs will fairly and adequately protect the interests of the

members of the class, in that their interests are not adverse to the interests of the other members of the class.

113.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy under the standards of Fed. R. Civ. P. 23 (b)(3).

114.    The named plaintiffs bring the second through the ninth claims for relief herein on behalf of themselves individually and all persons similarly situated as a class action pursuant to Federal Rule of Civil Procedure 23, in respect to all claims that the named plaintiffs and all persons similarly situated have against the defendants as a result of the defendants' violations under the FLSA, the Labor Law, the NYMWA, RICO, other provisions of the Federal Labor Law and the laws of the State of New York.

### FIRST CLAIM FOR RELIEF AGAINST ALL DEFENDANTS
### (FLSA)

115.    The named plaintiffs bring this first claim for relief pursuant to 29 U.S.C. § 216 (b) on behalf of themselves and all other similarly situated persons who consent in writing to join this action pursuant to 29 U.S.C. § 216 (b), and upon information and belief there are numerous such similarly situated persons .

116.    Pursuant to the applicable provisions of the FLSA, 29 U.S.C. § 206 and § 207, and the Wage Orders issued under the FLSA at 29 C.F.R. § 552, plaintiffs were entitled to a minimum wage and an overtime hourly wage of time and one-half their regular hourly wage for all hours worked in excess of forty hours per week.

117.    Plaintiffs worked more than forty hours per week for the defendants, and worked overnight shifts, and defendants willfully failed to make said minimum wage and/or overtime payments.

118.    The named plaintiffs on behalf of themselves and all other similarly situated

persons who consent in writing to join this action, seek, on this first claim for relief, a judgment

for unpaid overtime wages and unpaid minimum wages, such sums to be determined based upon

an accounting of the hours worked by, and wages actually paid to, the named plaintiffs and such

other similarly situated persons who consent in writing to join this action, and plaintiffs also seek

an award of liquidated damages, attorney's fees, interest and costs as provided for by the FLSA.

## SECOND CLAIM FOR RELIEF AGAINST THE HDA DEFENDANTS
### (NYMWA)

119.    Plaintiffs repeat each and every allegation previously made herein.

120.    Pursuant to the NYMWA, Labor Law Articles 6 and 19, Labor Law § 198 and the

Wage Orders issued under the NYMWA at 12 N.Y.C.R.R. §§ 137-143, plaintiffs were entitled to

certain hourly minimum wages, overtime wages, supplemental and other wages, including but

not limited to call-in pay and pay for 10 hour shift and overnight shift, all of which the

defendants failed to pay in violation of such laws.

121.    Wherefore the named plaintiffs, on behalf of themselves and the within described

class of other persons similarly situated on this second claim for relief, seek a judgment against

the defendants for all wages which should have been paid, but were not paid, to the named

plaintiffs and such class members pursuant to the NYMWA and the Wage Orders issued

thereunder and the other provisions of the Labor Law the total amount of such unpaid wages to

be determined at trial upon an accounting of the hours worked by, and wages paid to, the named

plaintiffs and the other class members, along with an award of attorney's fees, interest and costs

as provided under the NYMWA and Labor Law § 198 and § 663.

## THIRD CLAIM FOR RELIEF AGAINST THE MUNICIPAL DEFENDANTS
### (42 U.S.C. 1983)

122.    Plaintiffs repeat and reallege each and every allegation previously set forth herein.

123.    The Municipal Defendants, under color of law, statute, ordinance, regulation,

custom or usage, deprived the plaintiffs of rights, privileges and immunities protected by the U.S.

Constitution and federal law, including the FLSA, by failing to compensate them with proper

prevailing, minimum and overtime wages for labor and services performed by plaintiffs.

124.    The aforesaid violations of the U.S. Constitution and federal law were committed

by the Municipal Defendants pursuant to an official custom, policy or practice of the said

defendants.

125.    Defendants' unconstitutional conduct has proximately caused each of these

plaintiffs to suffer monetary and non-monetary injuries and damages including the violation of

their constitutional rights, loss of earnings and pain and suffering.

## FOURTH CLAIM FOR RELIEF AGAINST DEFENDANTS GRUENWALD, KESTENBAUM AND DEFENDANT PERSONNEL SPECIALISTS
### (Civil RICO)

126.    Plaintiffs repeat each and every allegation previously made herein.

127.    Defendant HDA is an enterprise as that term is defined in 18 U.S.C. § 1961(4),

which engages in, and the activities of which affect, interstate commerce.

128.    Defendants Gruenwald, Kestenbaum and Defendant Personnel Specialists are

"persons" as that term is defined in 18 U.S.C. § 1961 (3) and are employed by and associated

with the said enterprise.

129.    Defendant Personnel Specialists engaged in a pattern of racketeering activity as

defined by 18 U.S.C. § 1961 in that they maintained a pattern and/or practice of demanding

"kickbacks" from the plaintiffs in exchange for placement and continuing employment with

HDA, and Defendant Personnel Specialists would refuse job assignments, withhold  wages, give

plaintiffs less desirable job assignments unless plaintiffs made payment in cash to defendants as

demanded and would otherwise exploit the plaintiffs' fear of economic harm in order to induce

them to pay the defendants, all of which was done with the knowledge and acquiescence of defendant HDA and defendants Gruenwald and Kestenbaum, its president and executive director.

130.   Said acts on the part of these defendants constitute a pattern of extortion, which is chargeable under New York State Penal Law § 155.30 (Grand Larceny in the Fourth Degree) and punishable by imprisonment for more than one year and is indictable under 18 U.S.C. § 1951, otherwise known as the Hobbs Act.

131.   Defendants Gruenwald's, Kestenbaum's and Defendant Personnel Specialists' acts constitute a violation of 18 U.S.C. § 1962 (c) in that defendants, who were employed by and/or associated with an enterprise with activities that affect interstate commerce, conducted or participated in the conduct of the enterprise's affairs through a pattern of racketeering activity.

132.   Defendants Gruenwald's, Kestenbaum's and Defendant Personnel Specialists' acts constitute a violation of 18 U.S.C. § 1962 (d) in that defendants conspired with each other to violate 18 U.S.C. § 1962 (c).

133.   As a result of the foregoing, plaintiffs have been injured in their persons and their property in that they have paid the aforesaid "kickbacks" under duress and fear of economic harm and/or have sustained loss of earnings and mental anguish and are therefore entitled to treble damages, punitive damages, costs and expenses of the suit and reasonable attorneys' fees.

### FIFTH CLAIM FOR RELIEF AGAINST THE HDA DEFENDANTS
**(Labor Law Sections 198-b and 193)**

134.   Plaintiffs repeat each and every allegation previously made herein.

135.   Defendant Personnel Specialists have, on numerous occasions as set forth herein, demanded, requested and/or received returns, donations and/or contributions from plaintiffs' wages and salaries, both before and after plaintiffs were engaged in employment through

defendant HDA, upon the statement, representation or understanding that failure to comply with such request or demand would prevent plaintiffs from procuring or retaining employment, in violation of section 198-b of the Labor Law.

136.    In addition, the foregoing constitutes a violation of section 193 of the Labor Law, in that the defendants required plaintiffs to make the aforesaid payments, which were not authorized in writing by the employees or for the benefit of the employees.

137.    Defendant HDA also made unauthorized deductions from plaintiffs' wages when plaintiffs failed to make timely payments as directed by the defendants, in violation of section 193 of the Labor Law.

138.    As a result of the foregoing, plaintiffs have been damaged in an amount to be determined at trial upon an accounting of the "kickbacks" paid by the named plaintiffs and the other class members to the defendants, and have further sustained loss of earnings and mental anguish and emotional distress in an amount to be determined at trial.

139.    In addition, as defendants' conduct has been willful and contumacious, plaintiffs are entitled to punitive damages.

### SIXTH CLAIM FOR RELIEF AGAINST THE HDA DEFENDANTS
#### (Unjust Enrichment)

140.    Plaintiffs repeat each and every allegation previously made herein.

141.    Defendants HDA, Gruenwald, Kestenbaum and Personnel Specialists have been unjustly enriched to the detriment of Plaintiffs because they have received unlawful "kickbacks" from the plaintiffs and have made unauthorized deductions from Plaintiffs' wages but have not compensated Plaintiffs for said payments.

142.    As a result of defendants' unjust enrichment, plaintiffs have been damaged in an amount to be determined at trial upon an accounting of the "kickbacks" paid by the named

plaintiffs and the other class members to the defendants and the unauthorized deductions made from their wages.

## SEVENTH CLAIM FOR RELIEF AGAINST HDA
### (Negligent Hiring and Supervision)

143.    Plaintiffs repeat each and every allegation previously set forth herein. Defendant HDA had a duty to supervise its employees, servants and agents and to exercise due care in the hiring and retention of its employees, servants and agents, including the defendant Personnel Specialists.

144.    Defendant HDA knew or should have known, prior to the occurrences described above, that its employees, defendant Personnel Supervisors were demanding "kickbacks" from and threatening economic harm to other HDA employees.

145.    Upon information and belief, defendant HDA failed and neglected to make any or appropriate inquiries with respect to the character and actions, of defendant Personnel Supervisors prior to, at or subsequent to the time it employed them, even though their inappropriate and illegal conduct was brought to the attention of HDA's executive director.

146.    Defendant HDA had a duty to respond to the allegations concerning "kickbacks" and to intervene to stop such conduct on the part of defendant Personnel Specialists.

147.    Defendant HDA was negligent in hiring defendant Personnel Specialists and in retaining them as an employees.

148.    Defendant HDA was negligent in supervising its employees, defendant Personnel Specialists, with respect to the occurrences described above.

149.    HDA's negligence proximately caused injury to the plaintiffs by causing each to sustain damage in an amount to be determined at trial and each plaintiff is entitled to recover such amount from HDA upon the trial of this action.

150.     In addition, HDA's conduct has been reckless and grossly negligent, and Plaintiffs are entitled to punitive damages.

**EIGHTH CLAIM FOR RELIEF AGAINST DEFENDANTS THE HDA DEFENDANTS**
**(FLSA Retaliation)**

151.     Plaintiff repeats and realleges each and every allegation previously set forth herein.

152.     During the course of their employment by defendants, the plaintiffs engaged in statutorily protected conduct under FLSA § 15 (a) (3) or the defendants erroneously believed that the plaintiffs engaged in such conduct in that the plaintiffs did or were believed to have contacted the District Attorney's office and/or Attorney General's office and/or the Department of Labor concerning the defendants and unpaid wages and demands for "kickbacks."

153.     As a result, the plaintiffs suffered adverse employment actions at the hands of the defendants, in that their employment was terminated and/or they were constructively terminated and/or the conditions of their employment worsened and/or their rate of pay was reduced.

154.     The adverse employment actions were taken by the defendants against the plaintiffs as a result of the plaintiff's exercise of the protected conduct.

155.     As a result of the foregoing, the defendants have violated FLSA § 15 (a) (3).

156.     As a direct result of the defendants' retaliatory acts, plaintiffs have been damaged, have endured pain and suffering, have been degraded and humiliated, and have lost wages and benefits.

157.     Plaintiffs seek, on this claim, back pay, forward pay, and all other benefits, increments, etc., to which they are entitled, an additional equal amount as liquidated damages, compensatory damages sufficient to fully compensate them for injuries caused by the defendants'

retaliatory conduct and punitive damages, together with attorneys fees, costs of suit and pre and post judgment interest.

### NINTH CLAIM FOR RELIEF AGAINST THE HDA DEFENDANTS
**(Labor Law Retaliation)**

158.    Plaintiff repeats and realleges each and every allegation previously set forth herein.

159.    In committing the above mentioned acts, the defendants have discharged, penalized and discriminated against the plaintiffs, their employees, because the plaintiffs have made a complaint to their employer, or to the commissioner or his authorized representative, that the employers have violated the provisions of the New York State Labor Law, in violation of Section 215 of the New York State Labor Law and the plaintiffs have been damaged thereby.

160.    Plaintiffs seek, on this claim for relief, an injunction restraining defendants from violating  section 215 of the New York State Labor Law, and all other appropriate relief, including rehiring or reinstatement of the plaintiffs to their former positions with restoration of seniority, payment of lost compensation, damages and reasonable attorney's fees.

WHEREFORE, it is respectfully requested that the Court assume jurisdiction herein and thereafter plaintiffs demand a trial by jury and judgment against all defendants as follows:

1.    Compensatory damages in an amount to be determined at trial, including but not limited to damages for:

2.     Unpaid minimum, overtime, supplemental and other wages, together with pre-judgment interest;

3.    Back pay and front pay, and all benefits to which plaintiffs were entitled;

4.    Economic loss; and

5.    Pain and suffering and humiliation.

6.      Liquidated damages pursuant to the FLSA and NYMWA;

7.      Punitive damages in an amount to be determined at trial;

8.      Treble damages pursuant to RICO;

9.      An injunction restraining defendants from violating the foregoing laws and

         statutes;

10.     Plaintiffs' costs and reasonable attorneys' fees;

Together with such other and further relief that the Court deems just.

Dated: New York, New York
        November 27, 2006

                                   _____/s/_____
                                   ROBERT WISNIEWSKI (RW-5308)
                                   ROBERT WISNIEWSKI & ASSOCIATES, P.C.
                                   Co-counsel for Plaintiffs
                                   225 Broadway, Suite 612
                                   New York, New York  10007
                                   (212) 267-2101